# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

JIN ACKERMAN,

    Plaintiff

v.

GITTERE, et al.,

    Defendants

Case No.: 3:20-cv-00337-MMD-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 61 and 70

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's motion for partial summary judgment. (ECF No. 61.) Defendants filed a response. (ECF Nos. 68, 68-1 to 68-7.) Plaintiff filed a reply. (ECF Nos. 77, 78.) Defendants have also filed a motion for summary judgment. (ECF Nos. 70, 70-1-70-10, 72-1.) Plaintiff filed a response. (ECF Nos. 80, 80-1, 80-2.) Defendants filed a reply. (ECF No. 85.)

After a thorough review, it is recommended that Plaintiff's motion be denied, and that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983.

The Second Amended Complaint (SAC) is the operative complaint. (ECF NO. 45.) The court screened the SAC, and Plaintiff was allowed to proceed with: (1) Fourteenth Amendment Due Process claims in Count I against Moskoff, Homan, Gittere, Reubart, Cooke, Dzurenda, and Williams; (2) an Eighth Amendment failure to protect claim in Count II against Gittere and

Dzurenda; and (3) a Fourteenth Amendment Equal Protection Claim in Count III against Reubart, Gittere, and Daniels. (*See* ECF Nos. 8, 21, 31, 44.)

Plaintiff alleges that on October 13, 2019, an Asian/Pacific-Islander inmate attempted to murder an African American inmate at Ely State Prison (ESP), which sparked a racial riot in Unit 6B. Plaintiff claims that video camera footage shows several African American inmates threatening and attempting to attack Plaintiff with weapons as he was off to the side of the tier, attempting to comply with officers' commands to lower himself. Plaintiff claims the riot lasted over 15 minutes because ineffective tear gas was their only control measure.

**Count I Due Process**

Plaintiff alleges he was issued a notice of charges for an MJ16 murder/attempted murder. He claims that NDOC's Administrative Regulations (ARs) impose a 15-day time limit to amend a disciplinary charge. On November 11, 2019, Moskoff, the preliminary hearing officer, entered the unit to serve notices of charges and perform preliminary hearings for inmates related to the October 13, 2019 incident. Moskoff left the unit without stopping by Plaintiff's cell. Plaintiff assumed his preliminary hearing would be held on a later date.

Plaintiff later learned from paperwork he received after his full disciplinary hearing, that Moskoff amended his charge beyond the 15-day time limit to an MJ3 for battery. Plaintiff alleges Moskoff denied him due process when he failed to serve Plaintiff with the amended notice of charges or give him a preliminary hearing. In addition, Plaintiff claims Moskoff fabricated Plaintiff's responses on the form regarding refusing the notice of charges, refusing to have a preliminary hearing, his Miranda rights and witnesses. As a result, Plaintiff claims he went straight to the full disciplinary hearing with a two-page written defense on the wrong charge (murder instead of battery).

1    Plaintiff goes on to allege that Homan, who presided over his disciplinary hearing, agreed

2    to postpone his hearing for 24 hours so Plaintiff could craft a defense to the amended charge of

3    battery. Plaintiff was escorted back to his cell, and an hour later was asked if he wanted to talk to

4    Homan about the mitigating factors for his case. Plaintiff agreed, and he was escorted back to

5    talk to Homan. Homan told Plaintiff he reviewed video footage of the incident and confirmed

6    Plaintiff was attacked in the riot, and that it was known that the tear gas the officers had to quell

7    the riot was ineffective. Homan then said he was going to go ahead and start the hearing.

8    Plaintiff pointed out to Homan that he had not made a defense yet for this charge, but

9    Homan said because Plaintiff chose to return, he considered that consent to waive the 24-hour

10   period. He told Plaintiff that he could stay or the hearing would be held without him. In addition,

11   Homan denied Plaintiff's request to call witnesses. Homan then changed the charge from battery

12   to an MJ27 for rioting. Plaintiff contends Homan was only allowed to change the charge to a

13   lesser charge, and rioting was a lateral charge. He claims that Homan did not consider any

14   mitigating factors, and instead gave him the maximum sanctions: 90-days canteen and phone

15   loss, 60 days of stat time, as well as restitution.

16   Plaintiff appealed the disciplinary finding. He also reported Moskoff's conduct to Gittere,

17   Reubart, Cooke, and Dzurenda, but contends they refused to investigate. Instead, they told

18   Plaintiff that Moskoff performed his duties from the control tower, which Plaintiff disputes,

19   because the documents would have required Plaintiff's signature.

20   Plaintiff also alleges that Williams denied Plaintiff a restitution hearing or independent

21   review of the restitution that he claims was improperly assessed.

22   Finally, Plaintiff avers that despite the fact that he was not sentenced to disciplinary

23   segregation, he has spent over 200 days in the Behavior Modification Unit (BMU), which has the

same restrictions as inmates who were found guilty of attempted murder with respect to this incident. He has not had hearings or evaluations of his housing placement, and he was told he would be there indefinitely.[1]

**Count II Failure to Protect**

Plaintiff alleges at his disciplinary hearing, Homan revealed that it was known among ESP correctional officers that their only crowd control measure, tear gas, was ineffective, and a switch had been made to that product for cost saving purposes.

**Count III Equal Protection**

Plaintiff has served over 200 days in the BMU, where he is in lockdown for 23-hours a day, his movement outside of his cell is fully restrained, and he has greatly reduced access to rehabilitative programs, meaningful jobs, direct access to the law library, email and telephone communications. African American inmates who received the same sentence as Plaintiff in connection with this incident, on the other hand, were given almost immediate access to full privileges and non-restrictive general population housing. Plaintiff claims Reubart told him he would be in this housing indefinitely.  He alleges that Gittere and Daniels are aware of this situation, but nothing has been done to rectify the situation.

**Motions**

Plaintiff moves for partial summary judgment with respect to his due process claim in Count I against Moskoff and Homan regarding his notice of charges, preliminary hearing and disciplinary hearing, the due process claim in Count I against Reubart and Gittere concerning his placement in restrictive housing following the incident, as well as his equal protection claim in

---

[1] It appears from his partial motion for summary judgment, that Plaintiff attributes the alleged denial of due process rights related to his indefinite placement in restrictive housing to Reubart and Gittere.

1  Count III against Reubart and Gittere regarding the alleged racial housing segregation. (ECF No.
2  61.)

3  Defendants oppose Plaintiff's motion, and move for summary judgment, arguing:
4  (1) Plaintiff cannot prove Defendants violated his due process rights; (2) Plaintiff cannot prove
5  Cooke, Dzurenda, Reubart, or Williams personally participated in the alleged violation of
6  Plaintiff's due process rights; (3) Plaintiff failed to exhaust administrative remedies as to his
7  Eighth Amendment failure to protect claim and his equal protection claim; (4) Plaintiff cannot
8  prove Defendants violated his Eighth Amendment rights; (5) Plaintiff cannot prove Defendants
9  violated his equal protection rights; and (7) Defendants are entitled to qualified immunity. (ECF
10  No. 70.)

11  **II. LEGAL STANDARD**

12  The legal standard governing this motion is well settled: a party is entitled to summary
13  judgment when "the movant shows that there is no genuine issue as to any material fact and the
14  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*
15  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the
16  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*
17  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome
18  of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary
19  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the
20  other hand, where reasonable minds could differ on the material facts at issue, summary
21  judgment is not appropriate. *Anderson*, 477 U.S. at 250.

22  "The purpose of summary judgment is to avoid unnecessary trials when there is no
23  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

5

F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

6

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Facts**

The following facts are undisputed unless otherwise noted:

**1. NDOC's Disciplinary Process**

NDOC's AR 707.1 describes NDOC's disciplinary process, which has four components: the notice of charges, the preliminary hearing officer's inquiry and disposition, the disciplinary hearing, and the disciplinary appeal. (ECF No. 61 at 60.) After a notice of charges is prepared by the charging employee, the preliminary hearing officer can proceed with service of the notice of charges and obtain the inmate's signature or document a refusal to sign, refer it back for further clarification, or amend the charge. (*Id*. at 62-64, 66.)

If additional evidence is discovered after service of the notice of charges, but before the disciplinary hearing and a modified charge is warranted, the inmate is entitled to due process for

7

the modified charge, including issuance of an amended notice of charges within 15 days of discovery of the circumstances that resulted in modification of the charge (which may be extended for exceptional circumstances). (*Id*. at 64-65.)  After service, the preliminary hearing officer shall ask the inmate to submit a plea, and inquire into whether the inmate would like to call witnesses or make a statement. (*Id*. at 67.) In addition, the preliminary hearing officer must make sure the inmate has at least 24 hours to prepare for the formal disciplinary hearing. (*Id*. at 66.)

A major disciplinary offense, such as the one at issue here, must be referred to a full disciplinary hearing committee. (*Id*. at 68.) The disciplinary hearing officer or committee may consider the charge as written or reduce the charge to a more appropriate lesser charge. (*Id*. at 69.) If it is determined the inmate has been charged incorrectly, the charge may be amended, in which case, the disciplinary hearing should be rescheduled for no sooner than 24 hours after service of the modified charge, and the inmate should be informed in writing of the amended charge. (*Id*. at 70.)

If the inmate enters a plea of not guilty, the inmate should be given the opportunity to make a statement and present evidence and provide a written statement. (*Id*. at 73.) The inmate also has a qualified right to call witnesses on his behalf. (*Id*. 74.)

If the inmate is found guilty, the committee has discretion to give the inmate an opportunity to make a statement in mitigation before determining the appropriate sanctions. (*Id*. at 76.) In setting the sanction, the committee shall consider factors in mitigation and aggravation, including, but not limited to, whether the inmate has a minor or no prior disciplinary record, whether he has been involved in similar incidents where he was found guilty, whether the misconduct at issue was spontaneous or planned. (*Id*. at 81.)

8

Following a finding of guilt, the inmate may appeal the decision to the warden via the grievance process outlined in AR 740 within 10 calendar days. When initially filing a disciplinary appeal, an inmate must submit both an informal level grievance and first level grievance. The inmate may only submit one disciplinary appeal per offense-in-custody number. If an inmate does not agree with the warden's response to the first level appeal, he may appeal to the second level using the grievance process. (*Id*. at 78.)

### 2. The Attempted Murder and Ensuing Riot

There was an attempted murder of an African American inmate by an Asian/Pacific-Islander inmate on October 13, 2019, which sparked a racial riot between the two groups in Unit 6B of ESP. Plaintiff was present during the riot near the Unit 6B showers. (SAC, ECF No. 45 at 4; Reubart Decl., ECF No. 68-7 at 3 ¶¶ 6-7; Homan response to Request for Admission (RFA) No. 12, ECF No. 61-1 at 25.) The riot lasted at least 15 minutes. (Homan response to RFA No. 14, ECF No. 61-1 at 25.) Tear gas and foam projectiles were utilized, but these measures did not quell the rioters. (Kleer[2] report, ECF No. 61 at 35; Homan response to RFA No. 16, ECF No. 80 at 30.)

### 3. Notice of Charges & Preliminary Proceeding

On or around October 18, 2019, Plaintiff was given a notice of charges for an MJ16 disciplinary offense for murder. (ECF No. 61 at 35; ECF No. 68-1 at 13.) On or around November 9, 2019, the charge was amended from MJ16 murder to MJ3 battery with an explanation that the video revealed Plaintiff was involved in battery on another inmate during the incident. (ECF No. 61 at 36; ECF No. 68-1 at 10.)

---

[2] Kleer was a responding correctional officer and was the charging employee for Plaintiff's initial notice of charges.

Moskoff, who was a preliminary hearing officer, filled out paperwork indicating that Plaintiff entered a plea of not guilty to the amended charge for battery; that Plaintiff made no statement; and no witnesses were requested for the disciplinary hearing. The form has the indication "N" next to the statements "waive preparation," "waive hearing," and "refusal to sign," indicating that Plaintiff did not waive his preparation time or hearing, and he did not refuse to sign the paperwork. (ECF No. 61 at 37; ECF No. 68-1 at 9.)

According to Plaintiff, Moskoff went to other cells and served notices of charges and conducted preliminary hearings, but he did not approach Plaintiff's cell and did not serve him with the amended notice of charges or conduct a preliminary hearing. (ECF No. 61 at 3 ¶¶ 7-8; Defs.' Exhibit B.) The paperwork does not contain Plaintiff's signature. (ECF No. 61 at 37; ECF No. 68-1 at 9.) Moskoff admits that other inmates signed preliminary hearing documents in Plaintiff's unit that day. (ECF No. 61 at 50, Moskoff response to Interrogatory 7.) In response to an inmate request form ("kite") by Plaintiff, Lieutenant Donahue (not a defendant) advised Plaintiff that due to tier going on and time restraints, Moskoff talked to Plaintiff over the intercom system in the unit control room instead of in front of Plaintiff's cell. (ECF No. 61 at 54.) Plaintiff disputes that this occurred.

**4. Disciplinary Hearing**

On November 21, 2019, Plaintiff had a disciplinary hearing on the amended charge of battery with presiding disciplinary hearing officer Homan and disciplinary committee members Hernandez and Allred. (ECF No. 61 at 38-41; ECF No. 68-5 at 21-24; Defs.' Ex. B.) Plaintiff came to the hearing with a one and a half page written defense on the MJ16 charge for murder. (ECF No. 61 at 42; Defs.' Ex. B; Homan Response to RFA Nos. 2-3, ECF No. 61-1 at 32.) He was advised of his Miranda rights. (Defs.' Ex. B; ECF No. 61 at 40; ECF No. 68-5 at 23.)

1    Homan changed Plaintiff's charge from MJ3 battery to MJ27 rioting or inciting others to riot.

2    (Defs.' Ex. B; ECF No. 68-5 at 22; ECF No. 61 at 39.) Plaintiff entered a plea of not guilty to the

3    MJ27 rioting charge. (*Id*.)

4         Plaintiff requested to call Officers Kleer and Gonzalez as witnesses. The paperwork from

5    the hearing indicates his request was denied on relevance grounds. (ECF No. 61 at 38; ECF No.

6    68-5 at 21.) The recording of the hearing reflects that Plaintiff was asked what Gonzalez would

7    testify to, and Plaintiff responded that Gonzalez was at medical on October 13, 2019, when

8    Plaintiff's knife wound was cleaned out. Homan said that the knife wound deals with Plaintiff

9    being injured, but does not demonstrate why he participated and continued to participate in the

10   incident. Homan said that they had talked to Kleer, and Kleer said he saw Plaintiff at the

11   beginning of the incident in a defensive stature, but the incident involved over 20 inmates and

12   Kleer was not able to watch Plaintiff the whole time and could not verify what happened to

13   Plaintiff over the entirety of the incident. Homan said this was shown by the video. Homan asked

14   Plaintiff if there was anything Kleer would add to what the video showed, and Plaintiff said

15   Kleer saw his wound when it was fresh in the shower. (Defs.' Ex. B.)

16        Plaintiff was then asked if he wanted to make a statement. Plaintiff said that Kleer,

17   Guzman, and Gonzalez all told him they saw a group of African American inmates try to sneak

18   up on Plaintiff, and it was Plaintiff's position he did not start the incident, but he was only

19   reacting to their conduct. Homan asked him why he didn't leave the area after the initial "sneak

20   attack." Plaintiff responded that they video would show the African American inmates were

21   challenging any attempts to leave and make way to the gate. He asserted that even when they

22   were able to make their way to the gates, the riot was prolonged because the officers did not have

23   control. (Defs.' Ex. B.)

The committee found that while Plaintiff did not instigate the incident, he was involved and struck three other inmates when they came near his area. They concluded there was a clear path the entire time that Plaintiff could have taken to the control bubble, and that other inmates took, yet Plaintiff stayed in the area and continued to fight other inmates. They found him guilty of rioting. (Defs. Ex. B; ECF No. 61 at 39; ECF No. 68-5 at 22.)

Plaintiff was sanctioned to 90 days of canteen and phone loss, split restitution (with the others involved in the riot), 60-days statutory time referral, and the matter was referred to the Attorney General's Office for possible criminal prosecution. (ECF No. 61 at 39; ECF No. 68-1 at 22.)

According to Homan, Plaintiff was advised at the hearing that the charges were being changed and Plaintiff was asked if he wanted to move forward with the new charges, and Plaintiff agreed to continue the hearing based on the new charge. (Homan response to RFA No. 9, ECF No. 61-1 at 24; Homan response to Interrogatory No. 1, ECF No. 68-3 at 5.)

At the end of the hearing, Plaintiff noted he had not been served with the amended notice of charges and was not given a preliminary hearing. Homan told him that could be part of his disciplinary appeal. Homan said that he asked Plaintiff in the beginning if Plaintiff wanted to continue the hearing, and they went forward with the hearing based on Plaintiff continuing to make statements. Plaintiff said he thought Homan meant the next day, and Homan reiterated that Plaintiff continued to give information, which Homan took as Plaintiff waiving the 24-hour time period. (Defs.' Ex. B.)

**5. Disciplinary Appeal**

Plaintiff filed a disciplinary appeal through NDOC's grievance system. (ECF No. 80-2 at 28-44.) On November 21, 2019, he appealed the guilty finding and severity of the imposed

sanctions. He asserted he was served with the MJ16 murder charge by Moskoff, but Plaintiff was not served with the amended charge of MJ3 battery; the amended charge was made beyond the 15-day limit in the AR; and Moskoff fabricated responses attributed to Plaintiff on the paperwork. As a result, Plaintiff was required to go to a full disciplinary hearing with a defense for the wrong charge. At the hearing, Plaintiff claimed he told Homan he knew nothing about the MJ3 charge, and he was not given 24 hours to prepare his defense to the amended charge. He asserted that Homan asked him if he wanted to continue the hearing for another day, and Plaintiff agreed. Homan proceeded with the hearing, and then changed the charge to a lateral charge of MJ27, and did not consider the numerous mitigating factors and immediately sentenced Plaintiff to the maximum punishment. (ECF No. 80-2 at 18-20.)

Gittere denied the first level appeal on December 5, 2019. He found there was sufficient evidence to support the guilty determination; that regulation policies were followed; and the sanctions imposed were appropriate. In addition, he concluded that in the disciplinary hearing, Plaintiff claimed he was not served with the amended charge, and the committee offered to continue the hearing to a later date, but Plaintiff did not accept that offer. (ECF No. 70-2 at 9.)

On December 27, 2019, Plaintiff filed his second level appeal. He asserted that he was complying with officers' commands during the riot when inmates with weapons tried to attack him. He claimed that ESP officers did not respond appropriately to the riot. He reiterated he was never served with the amended notice of charges, and Homan told Plaintiff that he could complete the hearing or it would be conducted in his absence, and the sanctions imposed were inappropriate. (ECF No. 80-2 at 25-27.)

H. Wickham (not a defendant) denied the second level appeal, finding that the regulations were followed, and there was sufficient evidence to support the guilty determination. He further

concluded that Plaintiff was given the option of having his hearing at a later date, but he did not

accept that option, and so the hearing continued. (ECF No. 70-2 at 3.)

### 6. Plaintiff's Housing

After the October 2019 riot, Plaintiff was moved from Unit 6 general population pending

his disciplinary hearing, and then after his disciplinary hearing, he was moved back to the same

general population housing unit. (ECF No. 70-3 at 2; Reubart Decl., ECF No. 68-7 at 3 ¶ 8; ECF

No. 80 at 90, Reubart response to RFA 12.) Following another incident of violence between

Asian/Pacific-Islander inmates and African American inmates at ESP in January 2020,

Asian/Pacific-Islander inmates, including Plaintiff, were removed from general population at

ESP and placed in the BMU. (SAC, ECF No. 45 at 7-8; Reubart Decl., ECF No. 68-7 at 3 ¶¶ 9-

10; Gittere response to Interrogatory No. 5, ECF No. 61-1 at 40; Reubart response to

Interrogatory Nos. 3, 5, ECF No. 61-1 at 50; Cooke response to Interrogatory Nos. 6, 7, ECF No.

61-2 at 6; Reubart response to RFA 12, ECF No. 61-2 at 20.)

African American inmates were allowed access to general population, open tier units.

(ECF No. 61-2 at 7, Cooke response to interrogatory No. 8.)[3] Between January 2020 and at least

June 2022, Asian/Pacific-Islander inmates did not have access to housing in general population

open units at ESP. (ECF No. 61-2 at 20-21, Reubart response to RFA No. 15.) In May, June, and

July of 2021, Plaintiff's request to be classified to general population was deferred for 30 days,

with the reason listed as: "[d]ue to being unit porter." (ECF No. 70-3 at 3-5.)

As of January 2022, Plaintiff was told by Castro (not a defendant) there were no plans to

reintegrate Plaintiff into Unit 6. (ECF No. 61-2 at 58-59.)

---

[3] Plaintiff's discovery requests frequently refer to African American inmates as "Type 2" inmates, and Asian/Pacific-Islander inmates as "Type 4" inmates.

Reubart stated in a January 5, 2023, supplemental response to RFAs that Asian/Pacific-Islander inmates were  permitted to house in the workers unit in 6B and in Building 12 if they were otherwise eligible. (ECF No. 77 at 23.)

According to Reubart, the ESP Warden and Associate Wardens[4] made the decision to place Asian/Pacific-Islander inmates in segregated housing for their own safety and for the security of the institution. At that time, there were roughly 10 Asian/Pacific-Islander inmates at ESP, and roughly 300 African American inmates, so it was not possible to place the African American inmates in segregation. (Reubart Decl., ECF No. 68-7 at 3 ¶¶ 10-11.) Reubart states that Asian/Pacific-Islander inmates informed staff that the hostilities between them and African American inmates are ongoing. (Reubart Decl., ECF No. 68-7 at 3 ¶ 12.)

**B. Exhaustion**

Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to his equal protection claim against Reubart and Gittere and his failure to protect claim against Gittere and Dzurenda.

**1. Exhaustion Standard**

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through

---

[4] From January 2018 until January 2022, Reubart was an associate warden at ESP, and since January 2022, he has been the Warden at ESP. (Reubart Decl., ECF No. 68-7 at 3 ¶ 5.) Gittere is currently Deputy Director of NDOC, but between 2019 and 2021, he was the warden at ESP. (Gittere response to Interrogatory Nos. 1, 2, ECF No. 61-1 at 39.)

administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001). The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007).

"If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted).

Once a defendant shows the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the administrative remedies process)). The ultimate burden of proof, however, remains with the defendant. *Id*.

Exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*. (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but

1    also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654,

2    657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's requirements, and

3    not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199,

4    218 (2007). That being said, an inmate exhausts available administrative remedies "under the

5    PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural

6    problem and render a decision on the merits of the grievance at each available step of the

7    administrative process." *Reyes*, 810 F.3d at 658.

8        To reiterate, an inmate need only exhaust "available" administrative remedies. *See Ross*

9    *v. Blake*, 136 S.Ct.1850, 1858 (2016). "Accordingly, an inmate is required to exhaust those, but

10    only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action

11    complained of.'" *Id*. at 1859 (quoting *Booth*, 532 U.S. at 738).

12        **2. Exhaustion Within NDOC**

13        NDOC's exhaustion process is set forth in AR 740. Under that regulation, inmates must

14    proceed through three levels to complete the grievance process: informal, first, and second

15    levels. (ECF No. 70-8.) Inmates may not file a grievance that discusses specific claims or

16    incidents previously filed by the same inmate. (ECF No. 68-4 at 7.)

17        The grievance process is also utilized for disciplinary appeals. (ECF No. 70-8 at 2, 4;

18    ECF No. 61 at 78.) In that case, the inmate is required to file an informal level grievance that

19    states "for tracking purposes" and then proceed with the first and second levels. (ECF No. 70-8

20    at 12; ECF No. 61 at 78.)

21

22

23    ///

17

### 3. Equal Protection Claim against Reubart and Gittere

Defendants argue that Plaintiff never properly exhausted his claim that he was placed in segregated housing while African American inmates with his same sentence from the riot were allowed to be in general population.

Plaintiff filed informal level grievance 20063098255 on March 9, 2020, asserting there was racial discrimination and preferential treatment in housing and privileges of the "Crips" security threat group over Asian/Pacific-Islander inmates. (ECF No. 70-4 at 3-4.) He received an improper grievance memorandum from ESP Associate Warden David Drummond that same day, noting that the grievance was not placed directly in the grievance box. Plaintiff was instructed to re-submit the grievance. (ECF No. 70-4 at 2.)

On March 24, 2020, Plaintiff filed informal level grievance 20063099160, again asserting there was racial discrimination and preferential treatment of the security threat group "Crips" over Asian/Pacific-Islander inmates with respect to housing. (ECF No. 70-5 at 3-4.) Associate Warden David Drummond again issued an improper grievance memorandum. This time, however, he rejected the grievance on the basis that "specific claims or incidents [were] previously filed by the same inmate," referencing grievance 20063098255. (ECF No. 70-5 at 2.)

This is a classic example of the prison rendering the grievance process unavailable to an inmate. Plaintiff attempted to file a grievance regarding his equal protection claim, but it was rejected because it was not placed in the appropriate grievance box, and he was instructed to re-submit the grievance. When Plaintiff resubmitted his grievance as instructed, it was rejected on the basis that he had already raised this issue—in the grievance that had been rejected and he was told to resubmit. The remedy was unavailable because it operated "as a simple dead end" and Plaintiff was "thwart[ed] from taking advantage of the grievance process through machination,

18

1    misrepresentation or intimidation." *See Ross v. Blake*, 578 U.S. 632, 643-44 (2016); *see also*

2    *Fordley v. Lizarraga*, 18 F.4th 344, 352 (9th Cir. 2021) (citations omitted) ("where inmates take

3    reasonably appropriate steps to exhaust but are precluded from doing so by a prison's erroneous

4    failure to process the grievance, we have deemed the exhaustion requirement satisfied.").

5        Defendants' exhaustion defense fails as to the equal protection claim. Plaintiff's motion

6    should not be denied on the basis that he failed to exhaust administrative remedies, and

7    Defendants' motion should not be granted on that basis.

8        **4. Failure to Protect Claim Against Gittere and Dzurenda**

9        Defendants acknowledge that Plaintiff filed first and second level grievances regarding

10   his disciplinary hearing, and that the first level grievance discussed ESP staff being aware that

11   they did not have the tools to stop the violence. (ECF No. 70 at 17.) They argue the primary

12   purpose of the grievance was to appeal his guilty finding, and not to complain about the response

13   to the riot. (*Id*. at 17-18.) They also assert that under AR 740, a grievance cannot contain more

14   than one appropriate issue. He did not file any other grievance on the failure to protect issue.

15       Plaintiff filed a grievance on November 21, 2019, that served as his disciplinary appeal.

16   (ECF No. 70-2.) The grievance largely focuses on the alleged procedural defects in his

17   disciplinary action, as well as the severity of the sanctions imposed. (*Id*. at 7-8.) Plaintiff's first

18   level disciplinary appeal does state that Homan told him the warden and ESP staff were aware

19   they did not have the tools to stop inmate violence, including the riot. (ECF No. 70-2 at 8-9.) In

20   the part of the grievance form where he was to describe how his loss or damage occurred,

21   Plaintiff again said Homan admitted "ESP was aware they were not providing adequate tools to

22   stop an extended, isolated incidence of violence and/or 'riot.'" (ECF No. 70-2 at 28.) He went on

23   to state:

1
2
3
4

> This is a maximum security prison that has numerous stabbings,
> assaults, and riots every year. It is unacceptable for the warden to
> issue ineffective gear/tools to its staff and it was well-known
> throughout the facility that these tools were ineffective. I was a
> victim of a riot that lasted over 15 minutes where staff literally
> never gained any semblance of control and were forbidden from
> entering the unit.

5    (*Id.*)

6        In his second level grievance, Plaintiff again discussed the perceived procedural

7    deficiencies with respect to his disciplinary action. Plaintiff included a statement regarding the

8    officers' response to the riot: "The real issue is, where's the tear gas in the video? The crowd-

9    control measures? This is a max-sec prison! I could've escaped the riot if ESP responded

10   appropriately." (ECF No. 70-2 at 5.)

11       Plaintiff clearly asserted in his disciplinary appeal grievance that part of his defense to the

12   riot charge was that ESP's response to the riot was ineffective. (*See* ECF No. 68-5 at 11-12.)

13   ESP Officials could have directed Plaintiff to file another grievance on this particular issue, but

14   they did not do so. Instead, they appear to have ignored this aspect of his disciplinary appeal. An

15   inmate exhausts administrative remedies "under the PLRA despite failing to comply with a

16   procedural rule if prison officials ignore the procedural problem and render a decision on the

17   merits of the grievance at each available step of the administrative process." *Reyes*, 810 F.3d at

18   658. Prison officials did not reject the grievance under AR 740 because Plaintiff included more

19   than one appropriate issue, and they rendered a response on the merits at each level.

20   The court finds Plaintiff sufficiently exhausted administrative remedies for this claim through his

21   disciplinary appeal. Therefore, Defendants' motion for summary judgment should be denied

22   insofar as they argue Plaintiff failed to exhaust administrative remedies for the failure protect

23   claim.

**C. Count I Due Process vs Moskoff, Homan, Gittere, Reubart, Cooke, Dzurenda and Williams[5]**

Inmates "may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citations omitted). "Of course … the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id*. (citations omitted.) "Criminal disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id*. (citation omitted).

In the context of prison disciplinary proceedings, the prison must afford the inmate: (1) written notice of charges at least 24 hours before his disciplinary hearing so he may marshal the facts, prepare his defense, and clarify what the charges are; (2) a written statement by the hearing officer of the evidence relied upon and the reasons for taking disciplinary action; (3) the right to call witnesses and present documentary evidence, when doing so will not be unduly hazardous to institutional safety or correctional goals; and (4) legal assistance if the inmate is illiterate or the issues presented are legally complex. *Id.* at 563-69.

**1. Moskoff**

**a. Impartial Preliminary Hearing Officer**

First, to the extent Plaintiff moves for summary judgment on the basis that Moskoff violated his due process rights because he was not an impartial preliminary hearing officer because he was also involved in the October 2019 riot incident, Plaintiff's motion should be denied. Plaintiff's SAC does not include an allegation that Moskoff violated his due process

---

[5] Plaintiff only moves for summary judgment as to Moskoff, Homan, Gittere, and Reubart.

1 rights because he was not impartial, and the screening order did not allow him to proceed with

2 such a claim.

### b. Untimely Amendment of the Charge under the AR

4      Second, Plaintiff's motion should be denied and Defendants' motion should be granted to

5 the extent he alleges that Moskoff violated his right to due process when he amended the charge

6 beyond the 15-day time limit set forth in the AR. A violation of a prison regulation, without

7 more, does not establish the violation of a federal constitutional right. *See Sandin v. Connor*, 515

8 U.S. 472, 482 (1995) (no constitutionally protected liberty interest in prison regulations even

9 when they are phrased in mandatory terms); *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir.

10 2009) (violation of state prison regulations does not establish a federal constitutional violation);

11 *Case v. Kitsap County Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001) (no liability under

12 section 1983 for violation of prison policy, in the absence of proof the defendant violated a

13 constitutional right).

### c. Service of the Amended Charges and Preliminary Hearing

15      Plaintiff contends Moskoff violated his right to due process when he failed to serve

16 Plaintiff with the notice of amended charge and conduct a preliminary hearing and falsely

17 indicated that Plaintiff did not want to make a statement or call witnesses at his full disciplinary

18 hearing. This is consistent with statements he made during the recorded disciplinary hearing, and

19 in his disciplinary appeal. (Defs. Ex. B; ECF No. 68-5 at 7, 13-14.).

20      According to Defendants, Moskoff drafted another document charging Plaintiff with an

21 MJ3 for battery and stated that a preliminary hearing was conducted where Plaintiff did not

22 provide a preliminary statement and plead not guilty. (ECF No. 70 at 4.) They acknowledge

23 Plaintiff disputes he was served with the notice of amended charges and that a preliminary

1  hearing was conducted. Defendants argument appears to be that Moskoff did not violate

2  Plaintiff's rights because Plaintiff appeared for the disciplinary hearing where he was advised of

3  the change in charges to an MJ3 for battery, and later to an MJ27 for rioting, and Plaintiff waived

4  his right to have 24 hours written notice before the disciplinary hearing.

5         There is a genuine dispute of material fact as to whether Moskoff served Plaintiff with

6  the amended notice of charges and conducted a preliminary hearing. As will be discussed below,

7  there is also a genuine dispute regarding whether Plaintiff waived the required 24-hour notice.

8  Therefore, both Plaintiff's and Defendants' motions should be denied as to the due process claim

9  against Moskoff based on the allegation that he did not serve Plaintiff with the amended notice of

10  charges or conduct a preliminary hearing.

11        **2. Homan**

12              **a. Impartial Hearing Officer**

13         Preliminarily, Plaintiff argues in his reply brief that Homan was not an impartial hearing

14  officer. As with Moskoff, this is not an allegation of his SAC, and the screening order did not

15  allow him to proceed with this claim. Therefore, the court will not address this argument raised

16  for the first time in Plaintiff's reply brief.

17              **b. 24-Hour Notice**

18         Plaintiff alleges that Homan continued with the disciplinary hearing even though Plaintiff

19  was not given 24-hour notice of the amended charge. Homan asserts that he interpreted

20  Plaintiff's conduct of continuing to speak as waiving the 24-hour notice. Homan also argues that

21  Plaintiff's written defense to the murder charge applied to the rioting charge.

22         Plaintiff, on the other hand, maintains that he asked if he could continue the hearing for a

23  day so he could prepare a defense, as he had shown up to the hearing with a written defense for

1  the charge of murder. (*See* ECF No. 68-5 at 7.) He also asserts that Homan told him if he agreed

2  to proceed, he would give Plaintiff a "reduced" charge, but the charge was a lateral charge and

3  not a reduced charge. (ECF No. 80 at 6.) He claims Homan told him he could stay and

4  participate or the hearing would be held without him. (*Id*. at 7.)

5        In his disciplinary appeal, Plaintiff reported that Homan asked him if he wanted to

6  continue this hearing for the amended charge to another day, and Plaintiff agreed and was

7  returned to his cell. Homan then called him back to discuss the mitigating factors in his case, and

8  said that he interpreted Plaintiff talking as consent to proceed with the hearing, and Plaintiff

9  could complete the hearing or choose for it to be completed outside of his presence. (ECF No.

10  68-5 at 7-8.)

11        At the end of the disciplinary hearing, when Homan said that he notified Plaintiff of the

12  amended MJ3 charge, he asked Plaintiff if he wanted to continue with the hearing, and Plaintiff

13  continued talking and giving information, which Homan interpreted as a waiver of the 24-hour

14  time period and continued on with the hearing that day. Plaintiff did say that he thought Homan

15  said they would continue the hearing until the next day.

16        The court finds there is a genuine dispute of material fact as to whether Plaintiff

17  knowingly waived his right to 24-hour notice of the disciplinary hearing on the amended charge.

18  Therefore, both Plaintiff's and Defendants' motions should be denied as to the due process claim

19  against Homan based on the alleged lack of 24-hour notice.

20              **c. Witnesses**

21        Homan did not allow Plaintiff to call witnesses Kleer and Gonzalez. Homan argues that

22  he was justified in not allowing Plaintiff to call these witnesses because the video would show

23  Plaintiff's involvement, and the fact that he had a knife wound was not relevant.

1    In the disciplinary hearing, Homan asked him what Gonzalez would say, and Plaintiff

2    responded that Gonzalez was in medical that day when his knife wound was cleaned out. Homan

3    denied the request to call Gonzalez, stating that the knife wound did not show why Plaintiff

4    participated and continued to participate in the incident. With respect to Kleer, Homan stated

5    Kleer confirmed he saw Plaintiff at the beginning of the incident in a defensive stature, but there

6    were over 20 inmates involved in this incident, and Kleer was not able to watch Plaintiff the

7    entire time and would not be able to verify what happened to Plaintiff during the entirety of the

8    incident, but the video evidence does. Homan asked Plaintiff if there was anything Kleer would

9    add, and Plaintiff said he also saw Plaintiff's wound when it was fresh.

10    The right to call witnesses in a prison disciplinary proceeding is a qualified right. "[T]he

11    unrestricted right to call witnesses … carries obvious potential for disruption and for interference

12    with the swift punishment that in individual cases may be essential to carrying out the

13    correctional program of the institution." *Wolff*, 418 U.S. at 566. "Prison officials must have the

14    necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses

15    that may create a risk of reprisal or undermine authority, as well as to limit access to other

16    inmates to collect statements or to compile documentary evidence." *Id*.

17    The Ninth Circuit has held that "[j]ail officials need not provide inmates an unfettered

18    right to call witnesses, but they must make the decision whether to allow witnesses on a case-by-

19    case basis, examining the potential hazards that may result from calling a particular person."

20    *Serrano v. Francis*, 345 F.3d 1071, 1079 (9th Cir. 2003) (citing *Mitchell v. Dupnik*, 75 F.3d 517,

21    525 (9th Cir. 1995)).

22    "Given th[e] significant limitations on an inmate's right to call witnesses, and given our

23    further observation in *Wolff* that '[w]e should not be too ready to exercise oversight and put aside

25

1 the judgment of prison administrators,' *ibid.*, it may be that a constitutional challenge to a

2 disciplinary hearing … will rarely, if ever, be successful." *Ponte*, 471 U.S. at 499.

3     The Ninth Circuit has upheld the denial of calling witnesses where the testimony would

4 be repetitive and when the hearing officer accepts the inmate's representation of what the inmate

5 would testify to. *See Bostic v. Carlson*, 884 F.2d 1267, 1271 (9th Cir. 1989), *overruled on other*

6 *grounds by Nettle v. Grounds*, 830 F.3d 922 (9th Cir. 2016); *Zimmerlee v. Keeney*, 831 F.2d 183,

7 188 (9th Cir. 1987).

8     The court finds that Homan set forth legitimate reasons for denying Plaintiff's requested

9 witnesses that are logically related to the correctional goal of providing swift discipline. From

10 the audio of the disciplinary hearing, Plaintiff appears to have agreed with Homan that the video

11 would show what Plaintiff was doing through the entirety of the incident, whereas Kleer would

12 not have been able to watch Plaintiff throughout the incident. Plaintiff's only basis for calling

13 Guzman was that Guzman observed his injury after the fact, which was not material to his

14 participation in the incident.

15     Insofar as Plaintiff asserts that Homan violated his due process rights by refusing to call

16 his witnesses, Plaintiff's motion should be denied, and Homan's motion should be granted.

17                 **d. Guilty Finding and Sanctions**

18     The requirements of due process are satisfied only if "some evidence" supports the

19 decision by the prison disciplinary committee. *See Superintendent, Mass. Corr. Inst., Walpole v.*

20 *Hill*, 472 U.S. 445, 455 (1985). The court's inquiry into whether the "some evidence" standard is

21 satisfied "does not require examination of the entire record, independent assessment of the

22 credibility of witnesses, or weighing of the evidence." *Hill*, 472 U.S. at 455. "Instead, the

23 relevant question is whether there is *any* evidence in the record that *could* support the conclusion

26

reached by the disciplinary board." *Id*. at 455-56 (citations omitted, emphasis added). "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Id*. at 457.

Plaintiff claims that the guilty finding on the rioting charge was not supported by the evidence, and therefore, the maximum sanctions imposed on him were inappropriate. Homan, on the other hand, argues there was some evidence, in the form of the video, to support the guilty finding and sanctions imposed.

After reviewing the video, the committee determined Plaintiff had several opportunities to escape toward the control room but he chose to remain in the riot, and as a result, he was involved in several altercations with inmates. (ECF No. 61-1 at 25, Homan response to RFA Nos. 11, 13; Defs' Exhibit B; ECFNo. 68-3 at 5, Homan response to Interrogatory No. 1.) While Plaintiff may disagree with the committee's conclusion that he had a way to escape, the court concludes there was some evidence to support the committee's conclusion. As such, Plaintiff's motion should be denied, and Defendants' motion should be granted insofar as he asserts Homan violated his due process rights by imposing maximum sanctions based on a finding of guilt he claims was not supported by the evidence.

### e. Lateral vs Reduced Charge

Plaintiff alleges that Homan violated his due process rights when he changed the charge at the disciplinary hearing from battery to rioting. Plaintiff claims this is not permitted under the AR because it is a lateral and not a reduced charge. This allegation implicates whether Plaintiff had adequate notice of the charge against him when the charge was amended from battery to rioting. This is separate from his claim he never received notice of the amended battery charge in the first place.

*Wolff* explained the purpose of notice is: 1) to give the inmate an opportunity to marshal the facts in his defense and 2) to clarify what the charges are. *Wolff*, 418 U.S. at 564. Given that there is a genuine dispute of material fact as to whether Plaintiff waived the 24-hour notice requirement for the battery charge, the court finds there is also a dispute of fact as to whether Plaintiff similarly waived 24-hour notice of this amended charge of rioting. Therefore, both Plaintiff's and Defendants' motions should be denied insofar as Plaintiff claims his due process rights were violated when Homan changed the charge at the disciplinary hearing from battery to rioting.

**3. Reubart & Gittere**

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). A change in the conditions of confinement, such as Plaintiff's confinement to the BMU, only rises to the level of a protected liberty interest if it amounts to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to the protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484.

Placement in punitive segregation alone does not make the conditions of confinement an "atypical and significant hardship." *Sandin*, 515 U.S. at 485; *Chappell*, 706 F.3d at 1063 (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("the Due Process Clause does not protect against all changes in conditions of confinement even where they 'hav[e] a substantial adverse impact on the prisoner involved.'").

The Supreme Court has declined to establish a "baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (noting

28

1 inconsistent conclusions among the circuits, but concluding that assignment to Ohio's

2 "Supermax" facility satisfied this standard "under any plausible baseline"). The Ninth Circuit has

3 concluded, however, that to determine whether a particular form of restraint imposes "atypical

4 and significant hardship," a court considers a condition or combination of conditions or factors

5 on a case by case basis, rather than invoking a single standard." *Chappell*, 706 F.3d at 1064

6 (citing *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996) (confirming that the inquiry is

7 "context-dependent" and requires "fact by fact consideration"). At least three factors have been

8 used to guide this inquiry: (1) "whether the conditions of confinement mirrored those conditions

9 imposed upon inmates in analogous *discretionary* confinement settings;" (2) "the duration and

10 intensity of the conditions of confinement;" and (3) "Whether the change in confinement would

11 inevitably affect the duration of the [prisoner's] sentence." *Chappell*, 706 F.3d at 1064-65 (italics

12 original) (internal quotation marks and citation omitted).

13        If a liberty interest is implicated, when an inmate is placed in segregated housing, he

14 must be provided, within a reasonable time after such placement, with an informal, non-

15 adversary review of the evidence justifying the decision to segregate the inmate. *See Hewitt v.*

16 *Helms*, 459 U.S. 460, 476 (1983), *abrogated in part on other grounds by Sandin v. Connor*, 515

17 U.S. 472 (1995). After placement in segregation, prison officials must periodically review the

18 initial placement. *See id*. at 477 n. 9.

19        First, neither side addresses whether Plaintiff's confinement in the BMU rises to the level

20 of an "atypical and significant hardship." Denial of Plaintiff's motion is appropriate on this basis.

21 He must first demonstrate there is no genuine dispute of material fact that he has a protected

22 liberty interest that justifies the application of procedural protections.

23

Second, assuming a liberty interest is implicated, Defendants argue (albeit in connection with Plaintiff's equal protection claim) that since being placed in segregation, Plaintiff requested to be classified to general population three times between May and July of 2021, and each time his request was deferred 30 days due to his job status as a unit porter. (ECF No. 70-3.) They contend this demonstrates plaintiff chose to remain in administrative segregation due to his job status.

Even if Plaintiff requested to stay in his housing for three months in May to July 2021, Defendants do not provide evidence that he received due process for the remainder of the time he has been in the BMU.

Third, Defendants assert there is no indication Reubart participated in Plaintiff's disciplinary hearing. The due process claim against Reubart and Gittere is directed not toward his disciplinary hearing, but Plaintiff's placement in the BMU without due process, *i.e.*, without periodic classification reviews. (ECF No. 70 at 14.) Reubart states in his declaration that after the January 2020 incident of violence between African American and Asian/Pacific-Islander inmates, the warden of ESP (Gittere at the time) and associate wardens (which included Reubart) made the decision to place the Asian/Pacific-Islander inmates in segregation for safety and security reasons. (Reubart Decl., ECF No. 68-7 at 3 ¶ 10.) This is evidence of Reubart's involvement in the alleged constitutional violation.

For these reasons, Plaintiff's and Defendants' motions should also be denied as to the due process claim against Reubart and Gittere.[6]

---

[6] In his response to Defendants' motion, Plaintiff asserts that Reubart, Gittere, and Williams denied him due process regarding his restitution; however, the restitution aspect of the due process claim is only proceeding against Williams.

1    **4. Cooke and Dzurenda**

2        Defendants argue there is no evidence Cooke and Dzurenda participated in Plaintiff's

3    disciplinary hearing or appeal.

4        "42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of

5    state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams*, 297

6    F.3d 930, 934 (9th Cir. 2002). "In order for a person acting under color of state law to be liable

7    under section 1983 there must be a showing of personal participation in the alleged rights

8    deprivation[.]" *Id*. (citations omitted); *see also Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir.

9    2019) ("inmates must show that each defendant personally played a role in violating the

10   Constitution").

11       In his response, Plaintiff asserts that Cooke admits to being responsible for record

12   keeping until 2021 and that she was aware of racial segregation.

13       Cooke is Associate Warden of Programs currently, but from 2019 to 2021, she was a

14   correctional casework specialist III, and she directly supervised all caseworkers and records staff

15   and was the PREA compliance manager at ESP. (ECF No. 80-1 at 23, Cooke response to

16   Interrogatory Nos. 1-2.) Cooke acknowledged that in response to incidents of violence between

17   Asian/Pacific-Islanders and African Americans, ESP *wardens* removed Asian/Pacific-Islander

18   inmates from the open general population tiers for their safety. (*Id*. at 24, Cooke response to

19   Interrogatory No. 5.) The question was specifically directed at what ESP *wardens* did in response

20   to the incidents of violence. It does not establish that Cooke, as a casework specialist, had any

21   involvement in the decision to segregate the inmates. Nor does her status as a supervisor of

22   records staff demonstrate such involvement.

23

1    Plaintiff presents no evidence that Cooke *personally participated* in Plaintiff's

2 disciplinary hearing, his appeal, or the decision to place Asian/Pacific-Islander inmates in

3 segregation or the alleged failure to review his classification status. Therefore, summary

4 judgment should be granted in Cooke's favor with respect to Plaintiff's due process claim.

5    Plaintiff states that Dzurenda is listed as a defendant because Reubart, Gittere, and Cooke

6 "blamed 'the Director' for the indefinite segregation in the meetings Cooke referenced." (ECF

7 No. 80 at 15.) Plaintiff provides no *evidence* to support this assertion. Therefore, summary

8 judgment should be granted in Dzurenda's favor as to the due process claim.

9    **5. Williams**

10    Plaintiff alleges that Williams denied Plaintiff a restitution hearing or independent review

11 of the imposed restitution.

12    In his reply brief in support of his partial motion for summary judgment, Plaintiff argues

13 that Defendants did not address that he received restitution for the attempted murder charge in

14 addition for the rioting charge. However, Plaintiff only moved for summary judgment against

15 Moskoff, Homan, Reubart, and Gittere. The restitution claim is proceeding only against

16 Williams; therefore, *Plaintiff's motion* should be denied insofar as he argues he is entitled to

17 summary judgment on the restitution claim against any other defendant.

18    In their own motion, Defendants argue that Williams did not personally participate in any

19 alleged constitutional violation as there is no evidence that Williams was involved in Plaintiff's

20 disciplinary hearing or appeal or assessed restitution as a sanction against Plaintiff. (ECF No. 70

21 at 15.)

22

23

Williams did respond to a grievance filed by Plaintiff regarding his dispute over restitution charges from the October 13, 2019 incident. (ECF No. 70-7 at 42-44.) This is a separate grievance from his disciplinary appeal.

In the grievance, Plaintiff asked for an itemized report and for someone to review his restitution to make sure he was not being charged for the bills for the victim of the first incident. He was referring to the attempted murder being the "first incident," as opposed to the ensuing riot, for which he was found guilty. Timothy Jones denied the informal level grievance.

In his first level grievance, Plaintiff clarified he was disputing being charged for the incident that preceded the riot. Gittere denied the first level grievance, stating that restitution is not a sanction and cannot be negotiated. He said: "while your charge was adjusted to reflect all factors it still does not absolve you from playing a role to some extent in the incident in question."

In the second level grievance, Plaintiff clarified that the original charge was an MJ16 for murder, and he was cleared of that after a review of the video footage. He was found guilty of the MJ27 charge for rioting, which is the second incident that occurred several minutes after the first incident. He was not disputing the restitution for the MJ27 rioting guilty determination, but for the murder/attempted murder incident. Williams responded at the second level. Williams said that Plaintiff was originally charged with an MJ3 for battery and not MJ16 murder, and then the charge was later amended to MJ27 rioting.[7] He said that restitution was an authorized sanction for that offense. He advised Plaintiff the committee sanctioned "split restitution," meaning the cost of the related expenses would be shared among the inmates who were also sanctioned to

---

[7] The evidence demonstrates that Plaintiff was initially charged with the MJ16 for murder, which was subsequently changed by Moskoff to MJ3 for battery.

split restitution. Williams determined the sanction was appropriate, and that by engaging in this behavior, Plaintiff became responsible for the damages caused by himself and others during the entire disturbance, not just a portion of it. (ECF No. 70-7 at 43.)

Plaintiff received notice of the punishment being imposed on him, including the restitution order, at the disciplinary hearing. Plaintiff filed a disciplinary appeal through all levels as well as a separate grievance on the restitution issue through all levels. Therefore, the court finds Plaintiff received sufficient due process with respect to the restitution imposed as he was given the opportunity to be heard on this matter at least twice. *See Dease v. MacArthur*, No. 3:05-cv-00294-LRH-VPC, 2007 WL 1827135, at *8-11 (D. Nev. June 21, 2007). Therefore, Defendants' motion for summary judgment should be granted on the due process claim against Williams.[8]

**D. Eighth Amendment Failure to Protect vs Gittere and Dzurenda**

Plaintiff was allowed to proceed with an Eighth Amendment failure to protect claim based on allegations that ESP's only crowd control measure, tear gas, was ineffective, and a switch had been made to that product for cost saving purposes.

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

---

[8] If the fact finder determines Plaintiff was not given due process in connection with his disciplinary hearing that resulted in the sanctions, it is possible the disciplinary action, including the imposed sanction, may be vacated.

guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corrections Corp. of America*, 714F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *See Farmer*, 511 U.S. at 834; *Labatad*, 714F.3d at 1160.

First, the deprivation must be, objectively, sufficiently serious. *Farmer*, 511 U.S. at 834 (citations and quotations omitted). When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citations omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). "Liability may only follow if a prison official 'knows that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it.'" *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847).

According to Gittere, prior to 2016, NDOC used 2-chlorobenzylidene malononitrile (more commonly known as "C/S") tear gas. In 2016, NDOC stopped using C/S tear gas and switched to Oleoresin Capsicum (more commonly known as "O/C") tear gas, due to O/C tear

1  gas' less deleterious effects on individuals. The switch was not made due to cost concerns.

2  Gittere believes the cost has been roughly the same for C/S versus O/C tear gas. Gittere was not

3  involved in the decision to change the type of tear gas used by NDOC. (Gittere Decl., ECF No.

4  70-9.)

5        Plaintiff presents no *evidence* to support his assertion that the O/C tear gas, that had been

6  utilized for some three years prior to this incident, was ineffective or less effective than the C/S

7  tear gas previously used by the prison. Nor does he present any evidence to substantiate his claim

8  that the switch was made to the O/C tear gas due to cost concerns. Therefore, Plaintiff has not

9  raised a genuine dispute of material fact with respect to his Eighth Amendment claim against

10  Gittere and Dzurenda and summary judgment should be granted in their favor on the Eighth

11  Amendment failure to protect claim.

12  **E. Fourteenth Amendment Equal Protection vs Reubart, Gittere and Daniels[9]**

13        "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment

14  from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974);

15  *Mitchell v. Washington*, 818 F.3d 436, 444 (9th Cir. 2016); *Harrington v. Scribner*, 785 F.3d

16  1299 (9th Cir. 2015). In *Johnson v. California*, 543 U.S. 499 (2005), "the Supreme Court was

17  unequivocal that strict scrutiny is the proper standard of review for an equal protection challenge

18  to a race-based prison policy." *Harrington*, 785 F.3d at 1305 (citing *Johnson*, 543 U.S. at 515).

19  This requires "the government to prove that the measures are narrowly tailored to further a

20  compelling government interest." *Id*. at 1306 (quoting *Johnson*, 543 U.S. at 509).

21

22

23  [9] Plaintiff only moves for summary judgment as to Reubart and Gittere. Therefore, his motion
    should be denied with respect to the equal protection claim against Daniels.

1    Plaintiff asserts that he was placed in the BMU while African American inmates

2 remained in general population even though they had the same charges/sanctions as Plaintiff.

3 Plaintiff argues that Defendants cannot show this was necessary to a compelling state interest,

4 and the decision to move all Asian-Pacific Islander inmates to the BMU and keep African

5 American inmates in general population was the least restrictive means available.

6    According to Reubart and Gittere, after two incidents of violence between Asian/Pacific-

7 Islanders and African American inmates at ESP in October 2019 and January 2020, it was

8 decided by the warden and associate wardens to place the Asian/Pacific-Islander inmates in

9 administrative segregation (referred to elsewhere as the BMU). (Reubart Decl., ECF No. 68-7 at

10 3 ¶ 10; ECF No. 61-1 at 40, Gittere response to Interrogatory No. 5; ECF No. 61-1 at 51, Reubart

11 response to Interrogatory No. 5.) At the time, there were roughly 10 Asian/Pacific-Islander

12 inmates, and roughly 300 African American inmates. Therefore, Reubart asserts that it was not

13 possible to place the African American inmates in administrative segregation. (*Id*. ¶ 11.) Reubart

14 says that since the October 2019 incident, Asian/Pacific-Islander inmates have told NDOC staff

15 there are ongoing hostilities between the two groups. (*Id*. ¶ 12.)

16    Defendants argue there was a *rational basis* to support the decision to segregate the

17 Asian/Pacific-Islander inmates. (ECF No. 70 at 21.)

18    "Racial classifications raise special fears that they are motivated by an invidious purpose.

19 Thus, we have admonished time and again that, '[a]bsent searching judicial inquiry into the

20 justification for such race-based measures, there is simply no way of determining … what

21 classifications  are in fact motivated by illegitimate notions of racial inferiority, there is simply

22 no way of determining … what classifications are in fact motivated by illegitimate notions of

23 racial inferiority or simple racial politics.'" *Johnson v. California,* 543 U.S. 499, 506 (2005)

1  (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality)). "We therefore

2  apply strict scrutiny to *all* racial classifications to 'smoke out' illegitimate uses of race by

3  assuring that [government] is pursuing a goal important enough to warrant use of a highly

4  suspect tool." *Id*.

5       In *Johnson*, the Supreme Court specifically held that strict scrutiny applies "where prison

6  officials cite racial violence as the reason for their policy." *Id*. at 507. "[R]acial classifications

7  'threaten to stigmatize individuals by reason of their membership in a racial group and to *incite*

8  *racial hostility*." *Id*. (citation omitted, emphasis original). "Indeed, by insisting that inmates be

9  housed only with other inmates of the same race, it is possible that prison officials will breed

10 further hostility among prisoners and reinforce racial and ethnic divisions." *Id*.

11      There is no question that the two groups of inmates were segregated based on their race

12 after the incidents of violence between the two racial groups in late 2019 and early 2020.

13 Therefore, strict scrutiny clearly applies.

14      Even though Defendants argue they had a *rational* basis for segregating Asian/Pacific-

15 Islander inmates, the court will consider whether Defendants asserted reason for segregating the

16 inmates constitutes a *compelling* government interest.

17      The Court has held that the "'necessities of prison security and discipline' … are a

18 compelling government interest justifying only those uses of race that are narrowly tailored to

19 address those necessities." *Johnson*, 543 U.S. at 512 (citing *Grutter*, 539 U.S. at 353

20 (THOMAS J., concurring in part and dissenting in part) (citing *Lee* for the principle that

21 "protecting prisoners from violence might justify narrowly tailored racial discrimination") (*J.A.*

22 *Cronson Co.*, 488 U.S. at 521 (SCALIA, J., concurring in judgment) (citing *Lee* for the

23 proposition that 'only a social emergency rising to the level of imminent danger to life and

limb—for example, a prison race riot, requiring temporary segregation of inmates—can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens.'").

"Strict scrutiny does not preclude the ability of prison officials to address the compelling interest in prison safety. Prison administrators, however, will have to demonstrate that any race-based policies are narrowly tailored to that end." *Id*. at 514 (citation omitted).

The court finds, and Plaintiff does not dispute, there was a compelling government interest for the initial segregation of Asian/Pacific-Islanders and African American inmates for safety and security of the inmates, staff and the institution in general. The court concludes, however, there is a genuine dispute regarding whether that compelling interest justified the continued segregation of the inmates and whether the segregation was narrowly tailored to meet that interest. Preliminarily, there is conflicting evidence in the record regarding whether the segregation has been continuously ongoing, or whether at some point, Asian/Pacific-Islander inmates were allowed to reintegrate into general population. Moreover, while Reubart states that since the October 2019 incident, Asian/Pacific-Islander inmates have told NDOC staff there are ongoing hostilities between the two groups, there is no evidence of when these reports were made, by whom or to whom to allow the court to conclude that continuing segregation was justified.

As a result of the disputed concerning the continuing segregation of the two racial groups and whether it remained justified by safety and security concerns and was narrowly tailored, Plaintiff's and Defendants' motions for summary judgment should be denied as to the Fourteenth Amendment equal protection claim.

/ / /

**F. Qualified Immunity-Due Process**

Defendants argue they are entitled to qualified immunity on Plaintiff's due process claims, arguing that to the extent the court concludes they violated any constitutional right, such right was not clearly established at the time of the alleged violation.

The court has recommended that the due process claims against Moskoff and Homan proceed to trial regarding the allegations that Moskoff denied Plaintiff due process in failing to serve him with the amended notice of charges and conduct a preliminary hearing, and Homan did not give Plaintiff 24-hour notice before his disciplinary hearing for the amended charge of battery and the charge of rioting. The court has also recommended that the due process claim against Gittere and Reubart proceed to trial on the allegation that Plaintiff was placed in segregation without due process.

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)). "For a constitutional right to be clearly established, a court must define the right at issue with 'specificity' and 'not … at a high level of generality.'" *Id*. at 968 (quoting *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019) (per curiam)).

"'[A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation confronted.'" *Id*. at 969 (quoting *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017)). "'While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate,'" and must "''squarely govern[ ]' the specific facts at issue[.]" *Id*. (citations omitted).

40

"The plaintiff 'bears the burden of showing that the rights allegedly violated were clearly established.'" *Id*. (quoting *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)).  "However, because resolving whether the asserted federal right was clearly established presents a pure question of law, we draw on our 'full knowledge' of relevant precedent rather than restricting our review to cases identified by the plaintiff." *Id*. (citing *Elder*, 510 U.S. at 516).

Construing the facts in favor of the Plaintiff, it would have been clearly established that due process is violated, in the absence of a waiver, if an inmate is not given 24-hour notice and time to marshal the facts and prepare a defense and learn what the charges are before a disciplinary hearing. It was also clearly established that an inmate placed in segregation must receive periodic reviews of that classification.

Therefore, Defendants are not entitled to qualified immunity with respect to the due process claims the court has recommended proceed to trial.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Plaintiff's motion for summary judgment (ECF No. 61) and **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (ECF No. 70) as follows:

(1) Defendants' motion should be denied insofar as they argue Plaintiff failed to exhaust administrative remedies as to the equal protection and failure to protect claims;

(2) Defendants' motion should be **GRANTED** insofar as Plaintiff alleges that Moskoff violated his due process rights when he amended the charge beyond the 15-day time limit set forth in the AR;

(3) Defendants' motion should be **DENIED** as to the due process claim against Moskoff based on the allegation that he did not serve Plaintiff with the amended notice of charges or conduct a preliminary hearing;

(4) Defendants' motion should be **DENIED** as to the due process claim against Homan based on the alleged lack of 24-hour notice;

(5) Defendants' motion should be **GRANTED** as to the due process claim against Homan based on the refusal to call witnesses;

(6) Defendants' motion should be **GRANTED** as to the due process claim against Homan based on the guilty finding and imposition of sanctions Plaintiff claims were not supported by the evidence;

(7) Defendants' motion should be **DENIED** as to the due process claim against Homan based on the allegation that he amended the charge at the disciplinary hearing from battery to rioting;

(8) Defendants' motion should be **DENIED** as to the due process claim against Gittere and Reubart based on Plaintiff's alleged segregation in the BMU without due process;

(9) Defendants' motion should be **GRANTED** as to the due process claim against Cooke and Dzurenda;

(10) Defendants' motion should be **GRANTED** as to the due process claim against Williams;

(11) Defendants' motion should be **GRANTED** as to the Eighth Amendment failure to protect claim;

(12) Defendants' motion should be **DENIED** as to the Fourteenth Amendment equal protection claim; and

42

(13) Defendants' motion should be **DENIED** insofar as they assert they are entitled to qualified immunity on the due process claim.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.


Dated: June 13, 2023

_____
Craig S. Denney
United States Magistrate Judge